UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
ALFRED SOLER,                      :

        Petitioner,       :       <u>REPORT & RECOMMENDATION</u>

    -against-             :       10 Civ. 4342 (LAP)(MHD)

UNITED STATES OF AMERICA,          :       05 Crim. 165 (RJH)

        Respondent.       :
-------------------------------x

TO THE HONORABLE LORETTA PRESKA, U.S.D.J:

   <u>Pro</u> <u>se</u> petitioner-defendant Alfred Soler commenced this
section 2255 proceeding to vacate his 2008 judgment of conviction
on charges (1) that he had committed a murder in the course of a
narcotics conspiracy involving at least five kilograms of cocaine,
in violation of 21 U.S.C. § 841(e)(1)(A) and 18 U.S.C. § 2, (2)
that he had violated the murder-for-hire provision of 18 U.S.C. §
1958 by committing the murder, and (3) that in the course of a
narcotics conspiracy he had murdered or aided and abetted a murder
involving the use of a firearm, in violation of 18 U.S.C. §
924(j)(1) and 18 U.S.C. § 2. Soler is currently serving three
concurrent life sentences on these convictions.

   In Soler's motion, he asserts no less than ten claims in
support of his effort to vacate his convictions. All involve

1

asserted violations of his right to the effective assistance of trial and appellate counsel. (Pet. at 2-3). Thus he complains that he had asked to testify in his own defense and that counsel failed to allow him to do so (grounds 1 & 6), that his attorney did not object to the absence of subject-matter jurisdiction in the trial court (grounds 2 & 3), that his counsel failed to show him the pre-sentence report (ground 4), that his appellate attorney failed to argue the trial court's lack of jurisdiction (ground 5), that his trial lawyer did not protect his right to confrontation (ground 7), that the trial attorney did not object to an "unconstitutional jury instruction" (ground 8), that his counsel failed to assert a statute-of-limitations defense (ground 9), and that the defense attorney did not investigate "exculpatory evidence" that the lawyer had in his possession (ground 10).

Soler has since also moved to amend his section 2255 motion to add still another claim. This new claim is also based on the contention that he was denied the effective assistance of trial counsel.

The Government opposes Soler's application for section 2255 relief as meritless. It also opposes his motion to amend as futile. For the reasons that follow, we agree, and accordingly recommend

2

that both motions be denied. We further conclude that an evidentiary hearing is unnecessary to reach this result.

Prior Proceedings

The charges against Soler and a co-defendant, Junior Custodios a/k/a "Guancho Trumpeta", stemmed from the drug-related murder of a man named Jose Martinez a/k/a "Cavello" on July 2, 1998. In substance, Soler was charged with having agreed at the behest of Custodios, the leader of a narcotics conspiracy, to murder Martinez, the leader of another narcotics conspiracy, in return for payment. The purported reason for the successful plot to murder Martinez was his failure to share with Custodios the proceeds of a narcotics robbery.

A federal grand jury returned a three-count superceding indictment on September 20, 2007, and Soler went to trial before the Hon. Richard J. Holwell and a jury on October 10, 2007.[1] The jury returned guilty verdicts on all three counts on October 19, 2007, and on June 5, 2008 Judge Holwell sentenced Soler to three

_____

[1] Soler's co-defendant, Custodios, was a fugitive, and hence Soler was tried on his own. (Berman's Sept. 7, 2007 letter to Dist. Ct. at 2 n.*).

3

concurrent life terms of imprisonment, to be followed by five years
of supervised release. (Resp. App. Br. at 1-3, reprinted at 2009 WL
3760707 (2d Cir.)).

Soler appealed his conviction to the Second Circuit. In doing
so, he argued that the evidence was insufficient to justify his
conviction on all three counts, that there was insufficient
evidence that Soler had knowingly joined a drug conspiracy, that
the court had erred in charging aiding and abetting in connection
with drug-murder-by-firearm count, and that it had committed
further errors in making a variety of evidentiary rulings. On April
28, 2009, the circuit court affirmed in an unpublished order,
rejecting each of Soler's contentions as a basis for vacating the
judgment. United States v. Custodios, 325 F. App'x 19 (2d Cir. Apr.
28, 2009).

Soler did not seek certiorari. Instead he filed the current
motion, which is dated April 26, 2010. He subsequently moved for
leave to amend that petition to add a claim that he characterized
as one of "actual innocence," but which amounted to a challenge to
his sentencing under section 924(j) based on the contention that he
had not himself wielded a firearm. We denied that application as
untimely under 28 U.S.C. § 2255(f). See Soler v. United States,

4

2010 WL 4456343, *3-5 (S.D.N.Y. Oct. 18, 2010), aff'd, 2010 WL 5173858 (S.D.N.Y. Dec. 20, 2010).

In July 2012, Soler filed an application in the Court of Appeals seeking leave under 28 U.S.C. § 2255(h) to file a second or successive motion in the District Court, embodying a different claim for ineffective assistance of trial counsel.[2] The circuit court denied the application, noting that the proposed pleading was technically not a second motion because the original section 2255 motion was still pending. Accordingly, it deemed the new pleading to be a motion to amend the original section 2255 motion to add the new claim, and it transferred that motion to this court to address whether the proposed new claim -- to the effect that trial counsel had either failed to convey a pre-trial plea offer to Soler or had over-optimistically encouraged him not to take it -- was timely under section 2255(f). Soler v. United States, 12-2919, Order (2d Cir. Aug. 13, 2012).

_____

[2] Soler sought this relief on the basis of his contention that the Supreme Court had recently recognized "a new rule of constitutional law made retroactive to cases on collateral review." (See "Application For an Authority to File a Second or Successive Motion Under 28 U.S.C. § 2255(h)(2) Pursuant to 28 U.S.C. § 2244(a)")(hereafter "Soler 2255(h) Application").

<u>ANALYSIS</u>

I. <u>The Rule 15 Motion</u>

We first address the movant's motion to amend, which, as noted, was transferred to this court by our circuit court. As reflected in Soler's submission to the Second Circuit and a letter brief that he later sent this court, he proposes to seek relief based on the contention that his trial counsel, Fred Cohn, Esq., and Peter Quijano, Esq., advised him to go to trial rather than consider any plea offer, and that counsel did so based on their unreasonably optimistic assessment that the Government could not prove that Soler was in fact the gunman who had shot and killed Mr. Martinez. (Soler 2255(h) Application at 2-4; <u>id.</u> at unsworn Soler Aff. 2 (hereafter "Soler 2d Cir. Aff."); Soler Aug. 18, 2012 letter to Dist. Ct.). Some portions of Soler's papers could also be said to assert that his lawyers in fact failed to communicate to him a plea offer (<u>e.g.</u>, Soler 2d Cir. Aff. at p. 2), although he never specifies any facts to support this alternative reading. This proposed new claim -- in either guise -- cannot be said to relate back to the filing of the original motion, nor does it fit within any of the provisions of section 2255(f) defining alternative accrual dates, and hence its assertion would be precluded by the

6

one-year statute of limitations embodied in section 2255.

Section 2255(f) imposes a one-year limitations period on the filing of a motion to vacate. The clock presumptively starts to run on "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1).[3] If, as in this case, the movant has unsuccessfully appealed his conviction to the United States Court of Appeals, but has not sought certiorari from the Supreme Court, the conviction will be deemed final when the time to seek such review expires. Clay v. United States, 537 U.S. 522, 525 (2003).

The Circuit Court affirmed Soler's conviction by decision

---

[3] Section 2255(f) provides three other dates that could trigger the commencement of the limitations period. They include:

(2) the date on which the impediment to making a motion created by government action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such government action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; and

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of diligence.

28 U.S.C. § 2255(f)(2)-(4). Of these, the only one invoked by Soler on his motion to the Second Circuit was (f)(3).

7

dated April 28, 2009. See generally Custodios, 325 F. App'x 19. Since Soler did not seek relief from the Supreme Court, his conviction became final ninety days later, on July 27, 2009, see Clay, 537 U.S. at 526 (citing Sup. Ct. R. 13(1)), and the deadline for filing a section 2255 motion was therefore July 27, 2010. Soler apparently signed the section 2255 motion on April 26, 2010 and handed it to his jailers that day, thus satisfying the one-year requirement under the prison-mailbox rule. See, e.g., Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001); see also Walker v. Jastremski, 430 F.3d 560, 562 n.1 (2d Cir. 2005) (citing Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993)(stating that "the date of filing a federal complaint by a pro se prisoner is, for statute of limitations purposes, the date of delivery to prison authorities.")). In contrast, however, his motion to the Second Circuit was dated July 4, 2012 and thus, insofar as it seeks to assert a new claim, it was presumptively untimely.

As reflected in the order of the circuit court, to rescue his untimely claim, Soler may invoke Rule 15(c), which in certain circumstances permits a proposed amendment to relate back, for limited purposes, to the filing of the original pleading. In Soler's case this effort must fail, however, because an amendment of a motion under section 2255 will relate back only if "the claims

8

added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." Mayle v. Felix, 545 U.S. 657, 663 (2005); see, e.g., Hoffenberg v. United States, 333 F. App'x 625, 628 (2d Cir. 2009); Beras v. United States, 2013 WL 1155415, *12 & n.126 (S.D.N.Y. March 20, 2013). This requirement generally limits relation back to cases in which "'the new claim is based on the same facts as the original pleading and only changes the legal theory.'" Mayle, 545 U.S. at 664 n.7 (quoting 3 J. Moore, et al., Moore's Federal Practice ¶ 15.19[2] at 15-82 (3d ed. 2004)).

Soler's original motion asserts a plethora of claims about the purported inadequacies of Soler's trial attorney during the trial, and in one respect he also complains about his appellate attorney. None of his criticisms, however, concerns the trial counsel's performance before the trial, much less his assessment at that stage as to the likely strength of the Government's case, or his advice regarding a possible plea agreement. In short, Soler's proposed supplemental pleading would not satisfy the Rule 15(c) requirements.

As the Supreme Court has noted, claims are not related for

this purpose merely because they concern "the same trial, conviction or sentence as a timely filed claim." Mayle, 545 U.S. at 662. Moreover, the fact that the timely claims are premised on various theories of ineffective assistance, as is the proposed new claim, does not itself demonstrate the requisite relatedness to a different criticism of counsel. As the District Court in this case previously observed, "even an ineffective assistance of counsel claim, when alleging a different ground for ineffective assistance, does not relate back to an earlier ineffective assistance claim." Soler, 2010 WL 5173858 at *4 (citing Billie v. Warden, 2010 3021517, *5 (D. Conn. July 29, 2010); Veal v. United States, 2007 WL 3146925, *4 (S.D.N.Y. Oct. 9, 2007)); accord United States v. Sessa, 2011 WL 256330, *22 (E.D.N.Y. Jan. 25, 2011)(new claim "will not relate back merely because it is premised on the same category of constitutional violation" as the original claim; one Confrontation Clause claim not related to the other); Valerio v. Phillips, 2007 WL 4191817, *5-6 (W.D.N.Y. Nov. 21, 2007).

Soler's proposed new claim concerns an aspect of counsel's performance that is entirely different from the failings that he targets in the original motion. Accordingly, Soler's proposed new claim does not arise from, or relate back to, the set of events encompassed by the many claims embodied in the initial motion.

10

Hence, Rule 15(c) does not rescue his motion to amend.

Apart from the possible application of Rule 15(c), at one point in Soler's motion to amend he invokes a provision of section 2255(h)(2) to demonstrate timeliness on the basis that the Supreme Court in 2012 recognized "a new rule of constitutional law in a Sixth Amendment right violation of a plea bargain process made retroactively applicable to [Soler's] case    on 'Collateral Review'". (Soler 2255(h) Application at 8-9). In making this argument, Soler cites the Supreme Court's decisions in Lafler v. Cooper, 132 S.Ct. 1383 (2012), and Missouri v. Frye, 132 S.Ct. 1399 (2012), as embodying "a new rule," and, although he does not mention the pertinent statutory provision, he is implicitly relying on section 2255(f)(3), which specifies that a section 2255 motion is timely if filed within one year from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."[4]

_____

[4] Soler's citation to section 2255(h)(2) is inapposite although indicative of his underlying theory. That provision concerns applications for leave to file a second petition and specifies that the Court of Appeals may approve such a filing if it certifies that it contains "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." As we have noted, the Second Circuit concluded that Soler's application presented no

11

The short answer to Soler's argument is that his proposed new claim does not rest on a right that (1) "was initially [and newly] recognized by the Supreme Court" in <u>Lafler</u> and <u>Frye</u> and (2) then made retroactively applicable to cases on collateral review. Soler's proposed claim is premised on the notion that the trial lawyer has an obligation to perform competently in the pre-trial phase when providing advice about whether to accept a plea offer. As the Supreme Court explicitly recognized in <u>Frye</u>, that obligation has long been reflected in its caselaw. <u>See</u> <u>Frye</u>, 132 S.Ct. at 1405-06 (discussing <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985); <u>Padilla v. Kentucky</u>, 130 S.Ct. 1473 (2010)). Insofar as the Supreme Court addressed that obligation in <u>Lafler</u> and <u>Frye</u>, it did not "newly recognize" the right on which Soler is relying in his current Rule 15 motion, but rather acknowledged a long recognized right and applied it to the specific circumstances and issues presented in those two cases. <u>See</u> <u>Lafler</u>, 132 S.Ct. at 1384-91 (discussing elements of prejudice that must be shown, assessing whether state court decision was "contrary to" established Sixth Amendment jurisprudence under 28 U.S.C. § 2254(d)(1), and determining required remedy for violation); <u>Frye</u>, 132 S.Ct. at 1405-11

---

second-petition issue, and should be deemed to be a motion to amend, thus triggering the need for a timeliness analysis.

(addressing showing of prejudice).[5] Indeed, the circuit courts -- including our own -- have repeatedly held that <u>Lafler</u> and <u>Frye</u> did not recognize a "new rule" for purposes of section 2255. <u>See</u>, <u>e.g.</u>, <u>Gallagher v. United States</u>, 711 F.3d 315, 315-16 (2d Cir. 2013); <u>United States v. Lawton</u>, 506 F. App'x 722, 726 (10th Cir. Dec. 19, 2012); <u>In re King</u>, 697 F.3d 1189, 1189 (5th Cir. 2012)(per curiam); <u>Hare v. United States</u>, 688 F.3d 878, 879-80 (7th Cir. 2012); <u>Buenrostro v. United States</u>, 697 F.3d 1137, 1140 (9th Cir. 2012); <u>In re Perez</u>, 682 F.3d 930, 932-34 (11th Cir. 2012). Finally, even if these two decisions were read as newly recognizing a right, neither held that their rulings are retroactively applicable to cases on collateral review.

---

[5] We acknowledge that the dissent in these two cases asserted that the Court was recognizing a new right, <u>see</u> <u>Lafler</u>, 132 S.Ct. at 1392-93 (Scalia, J., dissenting). <u>See</u> <u>id.</u> at 1398 ("Today's decision... opens a whole new boutique of constitutional jurisprudence ('plea-bargaining law')"). That said, the opinions for the Court, which bind us, read pre-existing precedent as dictating the recognition of a right to competent counsel in the course of the plea bargain process. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 1384 (citing <u>inter alia</u> <u>Padilla</u>, 130 S.Ct. at 1486; <u>Hill</u>, 474 U.S. at 57); <u>Frye</u>, 132 S.Ct. at 1405-06 (citing prior decisions reflecting entitlement to competent counsel at plea bargain stage). As the Court observed: "It is well settled that the right to the effective assistance of counsel applies to certain steps before trial... includ[ing] the entry of a guilty plea... <u>Hill</u> established that claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in <u>Strickland</u>." <u>Frye</u>, 132 S.Ct. at 1405 (citing <u>Hill</u>, 474 U.S. at 57).

In sum, Soler cannot use section 2255(f)(3) to avoid the untimeliness of his proposed new claim. Accord, e.g., Speed v. United States, 2013 WL 416026, *3 (S.D.N.Y. Feb. 4, 2013); Williams v. United States, 2013 WL 239839, *2 (S.D.N.Y. Jan. 23, 2013).

## II. The Merits of the Current Section 2255 Motion

We turn now to the claims originally asserted by Soler, all of which are premised on the asserted inadequacy of the representation that he received during his trial and on appeal. We first summarize the general criteria applicable to such Sixth Amendment claims.

### A. Sixth Amendment Standards

To demonstrate ineffective assistance of counsel, a petitioner must show that his lawyer's performance was "so defective that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,'" "and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). As summarized in Brown:

14

> To satisfy the first, or "performance," prong,
> the defendant must show that counsel's
> performance was "outside the wide range of
> professionally competent assistance," and to
> satisfy the second, or "prejudice," prong, the
> defendant must show that "there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the
> proceeding would have been different."

Id. at 79-80 (quoting Strickland, 466 U.S. at 690, 694); accord, e.g., Smith v. Spisak, Jr., 130 S. Ct. 676, 685 (2010); Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009); Henry v. Poole, 409 F.3d 48, 62-64 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).

It bears emphasis that the Strickland standard is quite deferential, and that a claim of constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide minimal professional representation. Thus, the court weighing an ineffective-assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and must "determine whether, in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord, e.g., Kimmelman v. Morrison, 477 U.S. 365, 386

15

(1986); Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001)(citing Strickland, 466 U.S. at 694).

These standards apply to the performance of both trial and appellate counsel. See, e.g., Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000). Indeed, our review of an appellate attorney's work "is particularly deferential." Dominguez v. United States, 2011 WL 1044585, *5 (S.D.N.Y. Feb. 23, 2011). Appellate counsel is not required to raise every conceivable issue; as the Supreme Court has observed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on

16

a few key issues." <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983);
<u>see</u> <u>also</u> <u>McKee v. United States</u>, 167 F.3d 103, 106 (2d Cir. 1999).
Thus, to establish a Sixth Amendment violation the defendant must
show that appellate counsel "omitted significant and obvious issues
while pursuing issues that were clearly and significantly weaker."
<u>Id.</u> (quoting <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994)).

### B. Assessment of the Sixth Amendment Claims

We address the merits of each of petitioner's ineffective-
assistance claims in turn. Before doing so, however, we briefly
summarize the evidence at trial, which plays a necessary role in
the assessment of some of Soler's criticisms.

### 1. The Trial Record

At the trial, the Government called nine witnesses, including
two cooperating individuals (Messrs. Alejandro Rodriguez and
Mercado Garcia) who admitted their involvement in a drug conspiracy
that triggered the killing of Mr. Martinez. Soler did not call any
witnesses.[6] From the evidence the jury was permitted to make a

---

[6] The only evidence offered by Soler consisted of a
stipulation concerning a photo identification of him by one of

17

series of findings that we summarize here.

Soler's employer, Custodios, and Martinez each engaged in the practice of committing armed robberies of narcotics dealers. Although the two did so with separate groups, some of their crew members were involved in both groups, and the two also sometimes acted jointly. (Tr. 320-21, 348-49). One of the cooperating witnesses, Alejandro Rodriguez, testified that he had been involved in six attempted robberies with Martinez and three with Custodios. (Tr. 326). He explained that usually the robberies were planned based on a tip from an insider, or "santero," who was participating in a drug deal, and that the robberies often involved physical violence. (Tr. 319, 330-34). Rodriguez provided descriptions of some of the robberies or planned robberies in which he had been involved with Custodios and/or Martinez. In his testimony he reported that the haul from such robberies could be substantial, since cocaine was valued at up to $25,000.00 a kilogram and the robbers sometimes seized as much as 40 kilograms. (Tr. 335-36, 345-51).

---

the conspirators, Alejandro Rodriguez, and a portion of a statement made to the police by Amanda Quinones -- Soler's former friend -- concerning his involvement in the shooting. (Tr. 776-79).

The events that led to the killing of Martinez involved a robbery near the intersection of Seaman and Dyckman Avenues. According to Rodriguez, he learned from an old friend, Guancho Bosquito, of the prospect for stealing a large quantity of cocaine. (Tr. 352). Bosquito told Rodriguez that the tip for this project had first come to Custodios through his own santero, but that the first attempt to steal the cocaine had failed. As a result, Bosquito, Rodriguez and Martinez undertook a second attempt, and on that occasion they stormed into a dealer's apartment at gunpoint and stole a bag with 26 kilos of cocaine. (Tr. 352-59, 381).

In Rodriguez's account, although the tip for this robbery had originally come to Custodios, Martinez refused to share any of the proceeds with him. Martinez defended this position by claiming that Custodios had previously refused to share the proceeds of an earlier robbery which had netted $872,000.00. (Tr. 359-60, 382-85, 388).

According to Rodriguez, in 1996 or 1997, after the dispute about the proceeds from these robberies had arisen, Martinez told Rodriguez and Bosquito that Custodios, who was then living in the Dominican Republic, would have to be killed. Moreover, he showed them a car at a garage that he owned, and told them that the car

19

was being sent to the Dominican Republic with guns that would be used to dispatch Custodios. (Tr. 348-52, 388-90, 392).

Custodios was in fact shot in the Dominican Republic in 1997 or 1998 but survived and recounted the event to Rodriguez and fellow robber Mercado Garcia. (Tr. 392, 397-98, 401-03, 668-69). At one point, Rodriguez told Custodios that Martinez and another member of his group, named "Lao," had been responsible for shooting Custodios. In apparent response, Custodios then told Rodriguez "Let's go to New York. I'm going to make you rich." (Tr. 402-03). This comment confirmed Rodriguez's assumption that Custodios would seek deadly retaliation against Martinez for his shooting. (Tr. 403-05).

The balance of the events that led to Soler being hired by Custodios to kill Martinez was largely filled out by the second cooperating witness, Mercado Garcia. According to Garcia, he had met Custodios in the Dominican Republic in about 1996. Garcia was a drug dealer in New York and knew that Custodios made a living by robbing narcotics dealers. (Tr. 662-64). The two actually engaged in criminal activity together in the Dominican Republic, including robbing a drug dealer there and threatening another dealer's family to coerce repayment of a debt owed to Garcia by the New York-based

20

dealer. (Tr. 662-68).

In connection with the latter effort, Custodios, who wanted to return to New York, offered to collect from the dealer, but Garcia told Custodios that he had a friend in New York to whom he could turn for such a task, the friend being Soler. (Tr. 665-68). Garcia testified that he had known Soler since approximately 1990 and had had occasional contact with him, starting with a drug-related meeting at the apartment of Garcia's cousin. He continued to see Soler on occasion after Soler began dating Garcia's cousin. (Tr. 545-48, 658, 660-61).

As recounted by Garcia, after Custodios was shot in the Dominican Republic, he indicated that he wanted to return to New York, as did Garcia. Custodios also told Garcia that he wanted to meet Garcia's New York enforcer friend, Soler. Garcia later saw Soler in the Dominican Republic and told him that he might be able to steer a job to him, and Soler advised that he was interested and gave Garcia his phone number. (Tr. 670-73).

When both Custodios and Garcia were back in New York, Custodios asked for an introduction to Soler, and Garcia arranged a meeting. (Tr. 673-75). At that meeting, for which Garcia was

21

present near the end, Soler told Custodios that he needed work, and Custodios remarked that he needed to obtain some money first and then would give Soler the details of the job. (Tr. 677; see also Tr. 678-790). Custodios and Garcia later participated in a robbery of a drug dealer that netted 40 kilograms of cocaine, thus apparently yielding the funds for Custodios to renew his dealings with Soler. (Tr. 679-83, 694-95).

Garcia testified that he arranged another meeting between Custodios and Soler, which he also attended, as did an associate of Soler referred to as "Yuyu." (Tr. 695-96). The four drove to the vicinity of a garage -- apparently the one owned by Martinez -- at which point Custodios identified a man standing in the garage as the person who had arranged for his shooting in the Dominican Republic, and he told Soler that he wanted that individual killed. (Tr. 697-99). Soler agreed but demanded $15,000.00 to do the job. Custodios agreed to pay this sum, with half in advance, as well to pay for a car that Soler would buy to use in the killing. (Tr. 699-700, 702-04). According to Garcia, he delivered the first installment of money to Soler the same day. (Tr. 704).

As recounted by Garcia, preparations for the murder included keeping surveillance near the garage, Soler's purchase of a car in

22

New Jersey, and further discussion of the plan between Garcia and Soler. (Tr. 700-01, 704, 708-09). Garcia also testified that in speaking with some of the men who had participated in the recent robbery of 40 kilograms of cocaine, he received confirmation that the problem between Custodios and Martinez stemmed from Martinez having kept the proceeds from an earlier drug robbery that should have gone to Custodios, and that Martinez had arranged the attack on Custodios in the Dominican Republic. (Tr. 707). Garcia later relayed this information to Soler, who had inquired why Custodios wanted him to kill Martinez. (Tr. 708).

On July 2, 1998, Martinez was shot and killed in his garage by two men. The police recovered shell casings from a nine-millimeter gun and a deformed bullet from a .38 caliber revolver. (Tr. 633-34, 766-70). They also recovered five bullets from Martinez's body and clothing, two .38 caliber bullets and three nine-millimeter slugs. (Tr. 770-71). The police thus determined that both weapons had been repeatedly discharged. (Tr. 767-72).

Two eyewitnesses testified at trial that they had seen two men in the garage with Martinez at the time of the shooting. One of the witnesses, Victor Padilla, had been standing outside the garage when he heard what sounded like gunfire and saw two men inside with

their arms extended. (Tr. 460). The other witness, Caleb Guadalupe, was inside the garage at the time and later identified Soler as having been involved in the killing. He reported that he had seen Soler arguing with Martinez and then gesturing to a second man, who approached and began shooting at Martinez. (Tr. 472-74). In addition, a representative of the Office of the Medical Examiner testified that an autopsy had revealed that Martinez had died from the effects of six gunshot wounds. (Tr. 299, 307).

Garcia also testified about the aftermath of the killing. He reported that he and Custodios had confirmed the event by driving past the garage and observing an ambulance and yellow police tape. (Tr. 710). At Custodios's direction, Garcia then telephoned Soler, who confirmed that "they had done the job" and demanded full payment for himself and Yuyu. (Tr. 710-11). Garcia delivered the second installment the same day to Soler and another man, referred to as "Cubano Boricua" or "Boricua Cubano". (Tr. 711-14). Later that day Soler and Yuyu met with Custodios and Garcia. In Garcia's account, Soler confirmed that he and Boricua Cubano had gone inside the garage and shot Martinez while Yuyu waited outside in a car. In discussing this event, Soler pointed to his nine-millimeter pistol and said that it "had never failed him". The two gunmen then also accepted an offer from Custodios for future similar employment.

24

(Tr. 715-16).

Further confirmation of Soler's role in the killing of
Martinez was offered by a friend of his named Amanda Quinones. (Tr.
580). She testified that she had been present in the apartment of
Soler some days after the murder, while Soler was speaking to
someone on the telephone. She heard Soler telling the other person
that he had committed a murder at a car location in the Bronx, that
he had shot the victim twice, that he had purchased a car to assist
in the killing and that he had $15,000.00. According to Quinones,
Soler later threatened to harm her if she ever revealed the
contents of that overheard conversation. (Tr. 581-85). She did not
disclose this information until a year and a half later, after
Soler had drunkenly attacked her. Fearing for her safety, she
eventually informed the police of the conversation she had
overheard. (Tr. 591–93, 595-98).


### 2. Assessment of Soler's Sixth Amendment Claims


#### a. Soler's Right to Testify


Soler first complains that his attorney improperly denied him
his right to testify and that this action significantly prejudiced

his case. (Pet. at 2, Pet'r Mem. at 18-22; see also Pet. at Ex. A).
In his reply he also argues, in somewhat inconsistent terms, that
his lawyer was ineffective in advising him not to testify. (Reply
at 3-4).

The short answer to Soler's assertion that his attorney
prevented him from testifying is that the trial transcript
demonstrates that this assertion is false. First, when his counsel
made his opening statement -- which Soler himself invokes -- he
stated that the decision whether to testify was a joint decision of
the lawyer and the defendant. (Tr. 282). Second, after the
Government rested, Judge Holwell engaged in a colloquy with Soler
that made crystal clear to the defendant that it was his decision
whether to testify and that plainly evidenced that Soler had
decided not to do so. The exchange proceeded as follows:

> THE COURT:    Mr. Soler, before your case is rested or
> finished completely, I want to satisfy myself that you
> understand that if you want to, you have the right to
> testify on the witness stand before the jury and, of
> course, you have the right not to get on the witness stand,
> but that either of those things are open, that you can
> either testify or not testify. Do you understand that?
>
> THE DEFENDANTS:    (Through the interpreter): Yes sir.
>
> THE COURT:    Do you wish to get on the stand and testify or
> do you wish not to testify?

THE DEFENDANT:   Not to testify.

THE COURT:   All right. Do you, therefore, give up or waive your right to get on the stand to testify?

THE DEFENDANT:   That's right, your Honor.

THE COURT:   All right. Thank you. Any other questions anyone wishes the court to address to the defendant?

MS. BERMAN:   Nothing from the government.

MR. COH[]N:   Your Honor, I just wish that you advi[s]e Mr. Soler that he can testify even if I have advised him not to, that's his absolute right.

THE COURT:   Do you understand that, Mr. Soler?

THE DEFENDANT:   Yes, your Honor.

(Tr. 781).


This exchange plainly establishes that Soler was aware that it was his decision whether to testify, and it further confirms that he chose not to do so. Thus his claim that his attorney prevented from doing so is demonstrably unsustainable. As the Seventh Circuit has noted: "[T]he defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand." Clark v. Underwood, 939 F.2d 473, 475-76 (7th Cir. 1991). Equally pointed is our own circuit court's observation that no hearing is required if the

movant's "proffer involved a generic claim -- one that can be, and is often, made in any case in which the defendant fails to testify -- based solely on his own highly self-serving and improbable assertions," especially when it is contradicted by credible evidence. Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001); see also Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013)("In determining whether the assertions in a § 2255 motion warrant discovery or a hearing, the court must... take into account admissions made by the defendant... for '[s]olemn declarations in open court carry a strong presumption of verity.'") (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).[7]

As for Soler's more recent assertion that counsel denied him effective representation because he advised Soler not to testify, this claim fails for the evident reason that Soler offers no basis to infer that this was unsound advice, much less that it prejudiced

---

[7] In Soler's reply, he concedes that he was questioned by the court and stated that he did not wish to testify. (Soler Reply Aff. at 1-2). His new assertion that, notwithstanding his representation to the court, he really wanted to testify that he was at home at the time of the murder and that someone named Julio Rodriguez could support that story does not respond to the explicit evidence in the transcript that he chose to forego testifying. (To the extent that he may be hinting that his attorney could have called Rodriguez, this implication is belied by the fact that Mr. Rodriguez does not even appear on the list of names that Soler, in reply, claims he conveyed to his attorney at the time as possible witnesses. See Pet'r Reply Ex. D).

him. Defendant's only effort to suggest what he might have said if called to the stand appears in his unsworn and unsigned "affidavit" annexed to his petition.[8] In that document, he asserted that he wanted to testify so as to deny that he had committed the murder, and to insist that he had nothing to do with "drug[] transactions between these people whom Garcia testified about," that he was paying his own rent, that he "never received any monies from any drug dealers, robbers or any other illegal activity," that Amanda Quinones was lying about his assault on her and that he knew nothing about the purported purchase of a car to assist in the murder. (Pet. at Ex. A pp. 3-5). He further asserted in purely conclusory terms that, if allowed to testify, "I would have produced evidence to support my testimony," such as the existence of publicly available reports about the murder, from which Quinones could have learned details to flesh out her story to the police and his knowledge that she was a drug addict. (Id. at 4-5; see also Pet'r Reply at 9 (Soler would have denied guilt and testified that the cooperating witnesses were lying and that there were others who could corroborate his story)).

These conclusory assertions are inadequate to sustain a Sixth

---

[8] Given Soler's pro se status, we ignore the procedural flaws in his submission of this document.

Amendment claim or to justify further inquiry by the court. As the Second Circuit has recently noted, "[t]o warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [defendant] to relief." Gonzalez, 722 F.3d at 131 (citing Machibroda v. United States, 368 U.S. 487, 494 (1962); United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987)). Soler here offers no basis to infer that there is "a reasonable probability" that if he had testified as he suggests, "the result of the proceeding would have been different." Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011)(quoting Strickland, 466 U.S. at 694). Since Soler identifies no specific information that he could have conveyed by his testimony that would have substantially reduced his risk of conviction, he cannot satisfy the standards of the Sixth Amendment.

The evidence against Soler was overwhelming. It included not only the testimony of drug dealers and robbers who had dealt with him and Custodios, and who freely admitted their involvement in the events that had led to the murder of Martinez, as well as the hiring of Soler to do the killing, but also testimony of an uninvolved member of the public -- Mr. Guadalupe -- who had witnessed the shooting and identified Soler as one of the two men

30

involved in the shooting, corroborative testimony by another member

of the public -- Mr. Padilla – who had seen the actions of the two

gunmen in the garage, and further confirmatory testimony by Soler's

own friend, Ms. Quinones, who had witnessed his admission of guilt.

Given this evidence, as well as the forensic police proof that

confirmed the testimony of defendant's co-conspirator Garcia, there

is no basis to infer that Soler's conclusory and entirely self-

interested assertion of innocence would have altered the balance in

the slightest. Moreover, had he taken the witness stand, he would

of course have been subjected to cross-examination about his

dealings with the various  self-described drug dealers who appeared

at trial as well as his prior criminal acts, and was hardly likely

to present as a credible witness.


In short, there was good reason for counsel to recommend that

Soler not testify and no reason to suspect that if he had advised

otherwise, the result of the trial would have been more favorable

to defendant. In sum, this claim, in whatever guise, fails as a

matter of law.


   b. Counsel's Failure to Investigate the Court's Jurisdiction


Soler   next   complains   that   his   trial   lawyer   failed   to

31

investigate the trial court's supposed lack of jurisdiction. (Pet. at 2; Pet'r Mem. at 4-18; Pet'r Reply at 10-11). He also targets his appellate counsel for the same purported failing. (Pet. at 3). The twin arguments that he presses for a lack of subject-matter jurisdiction are (1) that Congress lacks the authority to enact criminal laws that apply to crimes committed within the territorial jurisdiction of the states, as opposed to territories owned or controlled by the federal government, as defined by 18 U.S.C. § 7, and (2) that 18 U.S.C. § 3231 -- which invests the district courts with "original jurisdiction... of all offenses... against the laws of the United States" -- was improperly enacted by Congress because only 44 representatives were on the floor of the House when the bill in question was voted on. Both arguments are plainly meritless, and hence the failure of Soler's trial and appellate counsel to pursue them cannot amount to ineffective assistance of counsel.

Section 7 of the Criminal Code defines the "special maritime and territorial jurisdiction of the United States," but plainly does not purport to limit the territorial reach of the Criminal Code. Soler's argument to the contrary would eviscerate virtually the entirety of the federal criminal justice system, and not surprisingly has been uniformly and regularly rejected by the

courts as frivolous. See, e.g., United States v. Drachenberg, 623 F.3d 122, 2010 WL 4160093, *1-2 (2d Cir. Oct. 22, 2010); United States v. Nixon, 201 F.3d 442, 1999 WL 1253085, *1 (6th Cir. Dec. 17, 1999); United States v. Mundt, 29 F.3d 233, 237 (6th Cir. 1994); United States v. Garcia, 2009 WL 2781636, *3-4 (N.D. Fla. Aug. 28, 2009); United States v. Ramage, 2009 WL 4110321, *1-*2 (N.D.W.V. Nov. 25, 2009); Mahone v. United States, 2007 WL 604796, *3 (S.D. Ala. Feb. 21, 2007).

Article III of the Constitution provides that "[t]he judicial Power shall extend to all Cases in Law and Equity arising... under the Laws of the United States," U.S. Const. Art. III, § 2, and authorizes Congress to enact "all laws which shall be necessary and proper for carrying into execution its powers." U.S. Const. Art. I, § 8, cl. 18). Those powers include the regulation of commerce under the Commerce Clause, which itself authorizes the enactment of the provisions under Titles 18 and 21 that triggered the charges against Soler that led to his convictions. See, e.g., United States v. Walker, 142 F.3d 103, 111 (2d Cir. 1998)(upholding validity of 21 U.S.C. § 848(e) & 18 U.S.C. § 924(c) under Commerce Clause); United States v. McGriff, 287 F. App'x 916, 918 (2d Cir. 2008)(upholding 18 U.S.C. § 1958 under the Commerce Clause).

As for 18 U.S.C. § 3231, it grants jurisdiction to the federal courts to try charges involving federal crimes: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." This broad grant of subject-matter jurisdiction is valid and enforceable, and the courts have thus uniformly rejected challenges to it. See, e.g., United States v. Collins, 510 F.3d 697, 698 (7th Cir. 2007); Holt v. United States, 321 F. App'x 5, 5 (D.C. Cir. 2009); United States v. Woods, 263 F. App'x 704, 706 (10th Cir. 2008); Robinson v. United States, 2010 WL 1789931, *7 (S.D.N.Y. May 4, 2010); Ozsusamler v. United States, 2010 WL 3528888, *2 (S.D.N.Y. Sept. 2, 2010); United States v. Wolford, 2009 WL 1346034, *2 (W.D. Pa. May 13, 2009); Cardenas-Celestino v. United States, 552 F. Supp. 2d 962, 966-68 (W.D. Mo. 2008).

In short, petitioner's arguments on this point are plainly "frivolous," Collins, 510 F.3d at 698; Drachenberg, 632 F.3d at 124, and hence his Sixth Amendment claim premised on his articulated jurisdictional theories also falls of its own weight.

34

c. <u>The Failure to Share the Pre-Sentence Report with Soler</u>

Soler next asserts that he was denied adequate representation because his trial attorney did not share her copy of the pre-sentence report ("PSR") with him prior to sentence, thus denying him the opportunity to discuss "any possible objections and/or inconsistencies therein to mitigate sentence." (Pet. at 3; Pet'r Reply at 11-15). This claim is plainly groundless since the record reflects that counsel did share the PSR with Soler, and in any event Soler offers no evidence of prejudice.

At the sentencing hearing, Judge Holwell initially reported that he had reviewed the PSR and the submissions of both defendant and the Government. (Sentencing Tr. 2). He then asked defense counsel whether she had reviewed the PSR and discussed it with her client, and she confirmed that she had. (<u>Id.</u>). She then represented to the court that

> Mr. Soler has reviewed the defense submission with a Spanish speaking interpreter. But this morning he requested that I withdraw [from the PSR] the sentence that he exhibits short-term memory loss and has reportedly received a provisional diagnosis of early dementia. He objects to that being included in the report. I hadn't heard that before today, but I wanted to alert the Court to that. He specifically asked that I bring that up to you.

35

(Id. at 3). With the Government's consent Judge Holwell then struck the cited language from the PSR. (Id.). The court then directly addressed Soler as follows:

> THE COURT:   Mr. Soler, have you had the opportunity to review the presentence report and discuss it with Ms. Sharkey [defense counsel]?
>
> DEFENDANT:   Yes, your Honor.
>
> THE COURT: With the exception of the comment just raised by Ms. Sharkey, do either of you have any further objections to any of the factual recitations contained in the presentence report?
>
> MS. SHARKEY: I do not, Judge.
>
> THE COURT:   Mr. Soler, do you have any further objections?
>
> DEFENDANT:   Only that I maintain my innocence.
>
> THE COURT:   Thank you, Mr. Soler.

(Id. at 3).

Defense counsel then followed with an argument about the appropriate sentence. Finally, before pronouncing sentence the court turned to Mr. Soler and advised him that "if there's anything that you wish to say, now is the time for it." (Id. at 9). Petitioner responded that "[t]he only thing that I'm stating is that I'm innocent of that death that I'm accused of." (Id.). The court then made the necessary findings under the Sentencing

Guidelines and imposed three concurrent life terms on the defendant. (Id. at 9-12).

The record thus reflects that Soler had a full opportunity to review the PSR with his attorney and to make comments on it. In short, counsel cannot be shown to have fallen short of her professional obligations in this respect. It is also evident that Soler cannot demonstrate any prejudice, since he fails to point to any failing in the PSR that, if pointed out, would have likely altered the sentence that he received. In short, this version of his Sixth Amendment claim is obviously without merit.

### d. Counsel's Purported Failure to Confront Witnesses

Soler next argues that he was denied effective representation because his attorney did not object on the basis of the Confrontation Clause to the admission into evidence of the autopsy report. According to defendant, the use of the report was improper because the representative of the medical examiner who testified was not the one who had prepared the report. (Pet. 3; Pet'r Mem. at 23-26)(citing Crawford v. Washington, 541 U.S. 36 (2004), and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527 (2009)); Pet'r Reply at 15-16).

37

Although it is not clear from Soler's papers, we interpret his argument as challenging both the testimony of the medical examiner who took the witness stand, a Dr. James Gill, and the admission of the report, which was prepared by another staff member of the Medical Examiner's office. Petitioner's argument, to the effect that his attorney's silence amounted to ineffective assistance, is meritless.

We start by noting that Soler's trial took place in 2007. The line of caselaw on which he premises his Confrontation Clause argument did not begin to emerge, much less evolve, until 2004, with the issuance of the Crawford decision. In that case the Supreme Court reversed a conviction based on the introduction into evidence of a recorded inculpatory statement by the wife of the defendant, and it held that out-of-court statements by an unavailable declarant that are "testimonial" in nature may not be used against a defendant who did not have the opportunity before trial to cross-examine the declarant about the statement. 541 U.S. at 51-52, 59-60. This approach superceded prior caselaw that had suggested that at least some out-of-court statements would be admissible solely on the basis that they exhibited requisite indicia of reliability. See, e.g., White v. Illinois, 502 U.S. 346,

356 (1992); <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980).[9]

This holding left open the question of how to define the category of "testimonial" statements,[10] particularly with respect to forensic reports routinely prepared by a medical examiner. In

---

[9] In Justice Scalia's opinion for the Court in <u>Crawford</u>, he distinguished these cases and argued that the result and holding in <u>Crawford</u> were consistent with the results in virtually all preceding decisions, but recognized that the expressed rationale in prior decisions differed from that in <u>Crawford</u>. <u>See id.</u> at 57-61.

[10] In <u>Crawford</u> the Court ventured to offer some concededly incomplete definitional clarity to the term "testimonial"

> Various formulations of this core class of "testimonial " statements exist: <u>ex parte</u> in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially... [,] extrajudicial statements... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition -- for example <u>ex parte</u> testimony at a preliminary hearing.

541 U.S. at 51-52 (citations omitted). As the Second Circuit has noted, this passage does not purport to offer a comprehensive definition of the term "testimonial." <u>See United States v. James</u>, 712 F.3d 79, 88 (2d Cir. 2013).

essaying to answer that question, the Second Circuit held in 2006 -- one year before Soler's trial -- that autopsy reports could be admitted into evidence as a business record even without testimony by the preparer of the document. See United States v. Feliz, 467 F.3d 227, 230 (2d Cir. 2006). The premise for that holding was that the forensic report was prepared for the records of the Medical Examiner and not principally for use at trial. Id. at 233-37.

Subsequent decisions by the Supreme Court -- notably Melendez-Diaz in 2009; Bullcoming v. New Mexico, 131 S.Ct. 2705 (2011), two years later; and Williams v. Illinois, 132 S.Ct. 2221 (2012), the following year -- offered some guidance in assessing whether and when forensic reports may be admissible. Their general tenor was that the analysis turned on whether the document was prepared principally "for the purpose of establishing or proving some fact at trial." Melendez-Diaz, 557 U.S. at 324; see Bullcoming, 131 S.Ct. at 2719-20 (Sotomayor, J. concurring)(""When the 'primary purpose' of a statement is 'not to create a record for trial', the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause.")(quoting Michigan v. Bryant, 131 S.Ct. 1143, 1155 (2011)).  These decisions appeared to undercut the analysis in Feliz but not necessarily its conclusion.

In <u>Melendez-Diaz</u>, the Supreme Court rejected the business-record theory espoused in <u>Feliz</u>, and held that so-called "certificates of analysis" -- which identified a seized substance as a controlled substance -- were tantamount to affidavits and hence testimonial. <u>See</u> 557 U.S. at 310-11. That conclusion was mirrored in <u>Bullcoming</u>, which addressed the admission of a "certificate of analyst" summarizing the results of a blood-alcohol test. <u>See</u> 131 S.Ct. at 2710-11, 2713, 2717; <u>see also</u> <u>Bryant</u>, 131 S.Ct. at 1152-66 (addressing "primary purpose" test in assessing admission of victim's statement to police in possible emergency circumstances).

The specific rationale for recognizing "testimonial" status in forensic evidence was subsequently addressed in <u>Williams v. Illinois</u>, 132 S.Ct. 2221 (2012), in which the Court considered the admissibility in a rape case of testimony by an expert to the effect "that a DNA profile produced by an outside laboratory... matched a profile produced by the state police lab using a sample of petitioner's blood." <u>Id.</u> at 2227. The particular focus of the Court was on one segment of testimony in which the witness stated, apparently based on the outside lab report, that the lab's DNA profile had been created from semen found on the victim's vaginal swabs. <u>Id.</u> at 2227, 2230. The High Court ultimately held that this

41

testimony was admissible despite its reliance on a report the author of which did not testify; nonetheless, the various opinions in <u>Williams</u>, including a plurality opinion by Justice Alito, separate concurrences by Justices Breyer and Thomas and a dissenting opinion by Justice Kagan, offered neither consensus nor a holding that could provide precedential guidance as to the permissible uses of forensic evidence in the absence of the personnel who had done the testing. <u>See</u> <u>id.</u> at 2227-40 (Alito, J.), 2244-52 (Breyer, J., concurring), 2260-62 (Thomas, J., concurring), 2265-77 (Kagan, J., dissenting); <u>see</u> <u>also</u> <u>James</u>, 712 F.3d at 94-96.

The net result is that, in its most recent assessment of the issue, the Second Circuit held that the use of an autopsy report as the basis for medical testimony by witnesses who either had no role in the autopsy or did not perform some of the tests about which he testified was permissible under the Confrontation Clause. In so holding, the Court looked to pre-<u>Williams</u> Supreme Court precedent[11] and, noting the High Court's rejection of the business-record

---

[11] The Second Circuit concluded that <u>Williams</u>, because of the diversity of opinions and the conflicting analytical regimes that they represented, "does not... yield a single useful holding relevant to the case before us" and accordingly construed that decision as "confined to the particular set of facts presented in that case." <u>Id.</u> at 95. It therefore chose to rely on pre-<u>Williams</u> precedent. <u>Id.</u> at 95-96.

theory invoked by the circuit in Feliz, id. at 94, the circuit panel characterized the appropriate test as turning on whether "the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." Id. at 94-95 (citing and discussing Bullcoming, 131 S.Ct. at 2716; Bryant, 131 S.Ct. at 1155-56; Melendez-Diaz, 557 U.S. at 324). With that standard in mind, the panel examined the evidence reflecting the role of the Office of the Chief Medical Examiner and its relationship with the police, as well as the circumstances of the preparation of the autopsy report at issue in that case. At least in part because the deaths of the two victims in James had not initially been suspected to be homicides, the Court held that the record reflected that the autopsy reports had not been prepared primarily for use at trial. Id. at 96-102.

Based on this somewhat elongated exploration of the development of the law regulating pertinent Confrontation Clause jurisprudence, we conclude that petitioner's Sixth Amendment claim, insofar as it is premised on the introduction of the autopsy report and the related testimony of the Medical Examiner's representative, cannot be sustained. First, it cannot be said that counsel's

43

failure to object on the basis of a Melendez-Diaz-type analysis represented non-professional performance. Melendez-Diaz was not decided until two years after defendant's trial, and it represented a distinct change in the state of the law as it existed when Soler went to trial. Indeed, the controlling decision in this circuit at the time was Feliz, which had held that such forensic reports were not testimonial because they constituted business records of the Medical Examiner. Trial counsel cannot fairly be charged with inadequate performance based on his having not anticipated the overruling of Feliz by subsequent Supreme Court decisions, starting with Melendez-Diaz and culminating in Bullcoming and Williams. See, e.g., Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001)("An attorney is not required to forecast changes in the law.")(quoting Jameson v. Coughlin, 22 F.3d 427, 429 (2d Cir. 1994)).

Second, as we have observed, even after Melendez-Diaz the courts have failed to evolve a clear set of rules that would demonstrate the applicability of the Confrontation Clause to preclude the use of the autopsy report reflected in the record of Soler's trial. As noted, the Second Circuit has recognized that Supreme Court precedent, even as recently as 2012, does not conclusively establish the guidelines under which the use of forensic reports at trial -- both as evidence and as a basis for

witness testimony -- may intrude on a defendant's right of confrontation. This underscores the fact that counsel's 2007 performance, in not anticipating the path of the law as it has developed until now, cannot be deemed constitutionally suspect.[12]

Third, petitioner fails to demonstrate prejudice, as required for a successful Sixth Amendment claim. In light of the trajectory of the law in this area, he fails to demonstrate that if his attorney had objected, that step would have succeeded either in excluding the autopsy report and related testimony at trial -- given Feliz -- or, if not, that he would have been able to achieve a vacatur of the conviction on appeal. Furthermore, he fails to demonstrate that the exclusion of the Medical Examiner's report and testimony would likely have altered the result of the proceeding. The autopsy report confirmed that Martinez had died as a result of multiple bullet wounds, but that fact was hardly in dispute at trial in view of the testimony of at least one of the cooperating witnesses (Garcia), the two eyewitnesses who reported seeing or hearing heavy gunfire in the garage and Martinez's collapse in the

---

[12] We recognize that the death of Martinez was obviously the result of a homicide, thus distinguishing it from the deaths of the victims in James and arguably providing a basis for distinguishing the result in that case, although the James decision does not make plain what the outcome would have been if the victims, like Martinez, had plainly been murdered.

face of that firepower, the police testimony about the appearance
of Martinez's body and their recovery of nine-millimeter shell
casings and a deformed .38 caliber bullet, and the testimony about
Soler's admissions to two witnesses (Garcia and Quinones) that he
had shot Martinez.

In short, this aspect of Soler's attack on his trial counsel
is self-evidently flawed, and justifies neither a hearing nor
section 2255 relief.[13]

### e. Failure to Object to Jury Instructions

Soler next complains that his attorney denied him effective
representation because he did not object to an assertedly erroneous
instruction in connection with the first count -- that is, murder
in connection with a drug conspiracy punishable under 21 U.S.C. §
841(b)(1)(A). See 21 U.S.C. § 848(e). The targeted instruction
suggested that the quality and quantity of the drugs was not
relevant to whether a drug conspiracy had been formed. (Pet. at 2;

---

[13] In reaching this conclusion, we do not go so far as to
characterize counsel's acquiescence in the Medical Examiner's
evidence as a tactical choice. To do so would require an inquiry
into counsel's thought process, a step that is unnecessary for
the reasons that we have explained here.

Pet'r Mem. at 27-31; Pet'r Reply at 16-21). Soler argues that this statement was inconsistent with the requirement under section 841(b)(1)(A) that the Government prove that the defendant knew or could reasonably foresee that the conspiracy involved the type of drug and amount charged in the indictment. (See Pet'r Reply at 17 (quoting United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008)).

There is no dispute that the court did not specifically instruct, in so many words, that knowledge or reasonable foreseeability of the type and amount of drugs was an essential element of a violation of section 841, and that both the Government and defense counsel had "erroneously stated [to the trial court] that they did not believe [such] an instruction was necessary." Custodios, 325 F. App'x at 23. Even if we assume, however, that the failure of defense counsel to request this charge was, as the Circuit Court stated, "erroneous[]", that does not establish a violation of the Sixth Amendment. In this case petitioner fails to demonstrate that counsel's performance in this respect deprived him of his right to effective representation.

When assessing the validity of a challenge to a jury instruction, the court must read the charge in its entirety and give it the natural meaning that jurors are likely to have

47

attributed to it. See, e.g., United States v. Sabhnani, 599 F.3d 215, 237 (2d Cir. 2010); United States v. Quattrone, 441 F.3d 153, 177 (2d Cir. 2006); United States v. Mitchell, 328 F.3d 77, 82 (2d Cir. 2003). Moreover, if the predicate for a Sixth Amendment claim is that the attorney failed to request a particular instruction, petitioner must demonstrate prejudice, that is -- as noted -- that there is a reasonable probability that if the attorney had not committed the error, the outcome of the proceeding would have been altered. See, e.g., United States v. Kennedy, 21 F. App'x 82, 86 (2d Cir. 2001); Urena v. Lape, 715 F. Supp. 2d 325, 333 (E.D.N.Y. 2010); (see also Pet'r Reply at 20 (acknowledging prejudice element to Sixth Amendment claims).[14]

Petitioner focuses on a two-sentence statement in the course of the charge that he labels as "unconstitutional." The statement quoted by Soler is:

> I instruct you that the purity and actual quantity of the cocaine is not pertinent to your determination of whether a narcotics conspiracy existed so you need not be concerned with that in making your determination as to whether there

---

[14] Petitioner notes that if an instructional error involves an explanation of reasonable doubt (that is, erroneously diluting the prosecutor's burden), prejudice is presumed. (Pet'r Reply at 20-21)(citing Sullivan v. Louisiana, 508 U.S. 275, 280 (1993)). The asserted error here, however, did not involve a failure to charge the jury correctly as to reasonable doubt.

> was a conspiracy. You need only find that the co-
> conspirators agreed to participate in the distribution or
> possession with intent to distribute some quantity of
> cocaine.

(Pet'r Mem. at 28)(quoting Tr. at 958). Although, in the quoted

passage, the trial judge did not tell the jurors specifically that

to convict on the first count they must find that Soler knew or

could reasonably foresee the type and amount of drugs charged -- in

this case five kilos of cocaine -- the passage in question was not

addressed to that issue, but rather to the question of whether a

conspiracy existed. In the balance of the instructions addressed to

the first count, the court repeatedly stated that conviction

depended upon whether the defendant had joined a conspiracy that

encompassed the anticipated distribution of at least five kilos of

cocaine, and it made sufficiently clear that to join the conspiracy

he had to share that goal.


In explaining the first count, Judge Holwell first read the

pertinent portion of the indictment, which was drafted in terms

that conveyed the requirement that Soler have joined a drug

conspiracy that involved five or more kilos of cocaine. Thus, he

stated:

> Count One of the indictment charges that on or about July
> 2, 1990, while engaged in a narcotics conspiracy involving

five kilograms or more of cocaine, Alfred Soler, the defendant, and others, unlawfully, intentionally and knowingly killed or counseled, commanded, induced, procured, or caused the intentional killing of Jose Martinez.

(Tr. 949-50). The judge then went on to specify the elements that the Government had to prove to convict Soler on this charge, and specifically included, as one element, defendant's participation in a conspiracy that had the object of handling at least five kilos of cocaine:

In order to sustain its burden of proof with respect to the charge of intentional murder while engaged in a narcotics conspiracy, as alleged in Count One the government must prove beyond a reasonable doubt the following four elements: First, that the defendant engaged in the narcotics conspiracy alleged in Count One of the indictment; Second, that the narcotics conspiracy involved at least five kilograms of cocaine; Third, that while engaged in the narcotics conspiracy, the defendant either intentionally killed Jose Martinez a/k/a "Chavelo", or counseled, commanded, induced, procured, or caused the intentional killing of Martinez; and, Fourth, that the killing of Jose Martinez actually resulted from the defendant's actions. To find the defendant guilty of the charge specified in Count One, you must first determine, one, whether the defendant was engaged in a narcotics conspiracy; and, two, whether the conspiracy involved at least five kilograms or more of cocaine.

(Tr. 952-53). The judge subsequently went on to define what a conspiracy is, and in doing so he made clear that the conspirators had to share the purpose of the conspiracy, which in this case he had already defined as involving the distribution of five or more

50

kilos of cocaine. Thus he said:

> a conspiracy is an agreement or an understanding between two or more persons to accomplish by joint action a criminal or unlawful purpose. In this instance, the indictment alleged that the unlawful purpose or object of the narcotics conspiracy was the distribution and possession with intent to distribute more than five kilograms of cocaine.

(Tr. 954-55). It was only in the wake of these instructions that the Judge stated that, for the purpose of deciding "whether a narcotics conspiracy existed," the jurors need not consider the weight or purity of the narcotics involved. (Tr. 958). He then went on to reiterate that if the jury found that a conspiracy had been formed and that Soler had joined it, it would then have to make "a finding about the quantity of cocaine that the co-conspirators agreed to distribute or possess with intent to distribute." (Tr. 958).

The judge instructed that the jury had to determine whether Soler had joined the conspiracy "with knowledge of its unlawful purpose and in furtherance of its unlawful objectives," and he then went on to emphasize once again that an element that the Government must prove and the jury must find is that the co-conspirators had agreed to distribute five or more kilograms of cocaine:

If you conclude that the government has met its burden of establishing beyond a reasonable doubt the existence of the narcotics conspiracy alleged as an element of Count 1 and the defendant's membership in that conspiracy, you should then consider the second element of the crime charged, namely, whether or not the conspiracy involved an agreement to distribute or possess with intent to distribute five kilograms or more of a mixture and substance containing cocaine. In considering this element, I instruct you that you do not need to determine the precise quantity of drugs involved in the offense. Rather, with respect to the narcotics conspiracy alleged as an element of Count 1 you need only decide whether it involved an agreement to distribute five kilograms or more of a mixture or substance containing cocaine.

(Tr. 967-68).


These instructions, read -- as we must read them -- in their totality, plainly told the jurors that to have committed the charged crime, Soler must have joined a conspiracy and, to do so, he must have shared the purpose and goal of that conspiracy, which in this case was to distribute five or more kilograms of cocaine. Since we must assume that the jurors followed the instructions that they were given, see, e.g., Penry v. Johnson, 532 U.S. 782, 799 (2001)(citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)); United States v. Williams, 690 F.3d 70, 77 (2d Cir. 2012), we infer that they determined that Soler knew of, and shared, the goal of the conspiracy.

52

As for the passage from the charge that Soler quotes, it is equally plainly addressed to the far narrower question of whether a conspiracy existed, and it was followed by instructions that if the jurors so found, they would have to determine the amount and nature of the narcotics encompassed by that conspiracy. In short, that single instruction, read in context, was not misleading.

There remains the fact that the court did not instruct the jury specifically that the Government must show that Soler knew or could have reasonably foreseen that the conspiracy involved a goal of distributing five or more kilos of cocaine. Although, for reasons noted, the charge certainly conveyed that notion in substance, there is no question that the Second Circuit, in a decision post-dating Soler's trial, held that the Government must prove such knowledge or reasonable foreseeability, see Santos, 541 F.3d at 70-71 (citing United States v. Adams, 448 F.3d 492 (2d Cir. 2006)), arguably thereby implying that the trial court should instruct the jury on this point. Indeed, the panel so indicated when affirming Soler's conviction. Soler, 325 F. App'x at 23.

Soler's Sixth Amendment claim fails, however, for several reasons. First, the decisions in Adams and Santos specified an evidentiary requirement and did not themselves impose a requirement

53

regarding the content of the jury charge. It also bears noting that even as recently as 2010 -- three years after Soler's trial -- the Second Circuit recognized that its caselaw regarding the Government's evidentiary burden in this respect under section 841(b)(1)(A) was less than clear on its face, and articulated a governing standard that required the Government to prove knowledge or reasonable foreseeability as to the nature and amount of the drug only if the defendant was not directly involved in its distribution. See United States v. Andino, 627 F.3d 41, 45-47 (2d Cir. 2010). Given this ambiguous state of the law at the time of Soler's trial, the failure of Soler's defense counsel to demand an instruction explicitly addressing this issue does not equate to denial of minimally competent representation. See, e.g., Aparicio, 269 F.3d at 99 ("counsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance only when the trial court's instruction contained 'clear and previously identified errors.'")(quoting Bloomer v. United States, 162 F.3d 187, 193 (2d Cir. 1999)).

Second, as noted, the instructions as a whole that the court gave at Soler's trial conveyed the notion that to join a conspiracy the defendant must adopt its goal or purpose, and the court specified that the goal of the conspiracy in question was the

distribution of cocaine in amounts that equaled or exceeded five kilograms. Given this circumstance as well, it can hardly be said that counsel's performance in this respect so deviated from professional norms as to reflect a denial of minimal professional representation. See, e.g., Worjloh v. United States, 2012 WL 5873346, *3-4 (E.D.N.Y. Nov. 20, 2012); see also Aparicio, 269 F.3d at 99 ("when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance."); Brown v. Greene, 2007 WL 3286638, *3 (S.D.N.Y. Nov. 6, 2007), aff'd, 577 F.3d 107 (2d Cir. 2009) ("a reviewing court must view the challenged portions of the jury charge 'not "in artificial isolation," but rather "in the context of the overall charge."'" (quoting Justice v. Hoke, 45 F.3d 33, 34 (2d Cir. 1995)).

Soler's claim also fails because he cannot demonstrate meaningful prejudice. As noted, the charge actually given conveyed the gist of the instruction that Soler argues should have been requested by his attorney. In view of that fact and the evidence at trial, there is little reason to have expected a different result if the instruction invoked by Soler had been given. See, e.g., Cupp v. Naughten, 414 U.S. 141, 154 (1973); Worjloh, 2012 WL 5873346 at *4.

55

The record reflects that Custodios was engaged in wide-ranging and substantial drug-related activity, including robberies of dealers and threats to extract payments from them, and that he did so in the Dominican Republic as well as in New York. In addition, Garcia testified that when he first met Soler, the defendant was dealing with a number of cocaine distributors, thus indicating that he was familiar with the cocaine-distribution trade. Moreover, Custodios later offered him a murder-for-hire payment of $15,000.00 plus the cost of a car for use in the plot, plainly signaling that the narcotics transactions that triggered the murder plot were substantial. Finally, Garcia testified that Soler had asked him about the root of the problem that triggered the murder request, and that Garcia had explained the background to him.

Given this state of the record and the instructions actually transmitted to the jurors to determine whether Soler had joined the conspiracy to distribute five or more kilos of cocaine, there can be little doubt that the jury's verdict was based on an implicit finding that Soler had been aware of the nature of the conspiracy. There is equally little doubt that the same result would have been achieved if the court had added the instruction that to convict, the jurors must find either that Soler knew the scope of the conspiracy or that the scope of it was reasonably foreseeable to

him.[15]


### f. Counsel's Failure to Assert a Limitations Defense


Soler next criticizes his trial attorney for not having argued that Count One was barred by the applicable statute of limitations. (Pet. at 3; Pet'r Mem. at 32-35; Pet'r Reply at 21-23). To this end he invokes 18 U.S.C. § 3282(a), which imposes a five-year statute of limitations on the prosecution of offenses that are "not capital." He asserts that although he was charged with participation in a narcotics conspiracy that lasted until 2005, his only alleged participation was his shooting of Martinez on July 2, 1998, outside the limitations period based on the timing of the

---

[15] In the Government's opposition to the motion, it argues that this version of Soler's Sixth Amendment claim is also procedurally barred because the same theory was argued on appeal and rejected there. (Resp't Mem. at 55-56). This assertion is not justified. The claim that Soler raised on appeal was that the evidence was insufficient to convict him. (Soler App. Br., reported at 2008 WL 7072628 (2d Cir. Sept. 30, 2008) at 14). Although the panel referred to the failure of the trial judge to charge the jury on Soler's knowledge of the drug amount and/or its reasonable foreseeability, the Court treated the question as being whether that failure by the trial judge constituted plain error -- a standard attributable to the fact that defense counsel had not requested the instruction or objected to its absence. The Court of Appeals did not address the question of whether that failing constituted ineffective assistance of counsel, an analysis that does not call for an assessment equivalent to plain-error analysis of the trial judge's performance.

charge against him. This argument will not fly.

Although section 3282(a) establishes a five-year limitations period for "non-death" offenses, it excludes capital offenses. This exclusion is in recognition of section 3281, which specifies that "[a]n indictment for any offense punishable by death may be found at any time without limitation."

Count One charged Soler with a narcotics-related murder in violation of sections 841(b)(1)(A) and 848(e)(1), not merely participation in a narcotics conspiracy. A charge of intentional killing in connection with a drug conspiracy subjects the defendant to a potential death sentence. Specifically, section 848(e)(1)(A) provides that "any person engaging in an offense punishable under section 841(b)(1)(A) of this title... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death." Since Soler faced a potential death penalty on Count One, the charge was "punishable by death," and hence was not subject to a statute of limitations. See, e.g., United States v. Ealy, 363 F.3d 292, 296-97 (4th Cir. 2004); United States v. Dames,

2007 WL 1032257, *1 (S.D.N.Y. March 30, 2007); see also United States v. Payne, 591 F.3d 46, 57-59 (2d Cir. 2010)(whether crime is "punishable by death" depends on whether statute makes that sanction available, not whether it is actually imposed or is, as a practical matter, available in the specific case)(citing cases).[16]

In sum, there is no basis for Soler's contention that he had a viable limitations defense on this count. Accordingly, the failure of his trial attorney to pursue such a futile argument cannot be deemed ineffective assistance.

### g. Failure to Investigate Exculpatory Information

Soler's remaining Sixth Amendment claim is that his trial attorney did not adequately investigate possible leads and instead relied on the Government to provide such information. (Pet. at 3; Pet'r Mem. at 36-40; Pet'r Reply at 23-25). As for specifics, Soler

---

[16] The fact that participation in a section 841(b)(1)(A) drug conspiracy is a prerequisite to exposure to a potential death sentence under section 848 does not avoid this result. Regardless of whether the murder charge was brought more than five years after the end of the conspiracy, that charge is exempt from the statute of limitations that would be applicable to a straightforward section 841(b)(1)(A) count. See, e.g., Dames, 2007 1032257 at *1; United States v. Martinez-Martinez, 2001 WL 1287040, *2-3 (S.D.N.Y. Oct. 24, 2001).

asserts that there were "five" potentially available witnesses who might have been able to provide exculpatory testimony. (Pet'r Mem. at 39). In his initial petition he does not name them (id.); in his reply he lists six names that he claims to have conveyed to his trial lawyer (Pet'r Reply Ex. D), but he does not indicate whether they were susceptible to subpoena, whether they were willing to testify and, if so, what, if anything, they were competent to testify about, much less whether that testimony would have been exculpatory. Soler also proffers an affidavit from a federal prisoner named Freddy Abed, who reports that he was told by "Salvador Mercedes" -- assertedly a member of Martinez's gang -- that Mercedes was with Martinez when two "young Puerto Ricans" entered the garage and shot Martinez, and that he left the garage after the shooting but before the police came. (Pet. Ex. C; see also Soler Aff. at 3-4). Finally, Soler notes that the Assistant United States Attorney reported to defense counsel shortly before trial that an inmate named Frank Mejia had stated that he had heard from another inmate at the MDC that a Dominican man named "'Choqui' or 'Chuckee' may have been involved in the murder of Jose Martinez," although Mejia doubted the veracity of this story based on his own knowledge of Choqui. (Pet. at Ex. D).[17]

---

[17] Choqui is one of the six names appearing in Soler's list on reply (Pet'r Reply Ex. D), although, as noted, that list

This showing is inadequate to support a Sixth Amendment claim or to warrant a hearing on the matter. As we have noted, a hearing is not justified based on conclusory assertions of attorney incompetence; rather, the petition must be buttressed with specific facts that, if established, would warrant a conclusion that 2255 relief is justified. "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved, at a hearing would entitle him to relief." Gonzalez, 722 F.3d at 131 (citing Machibroda, 368 U.S. at 494; Aiello, 814 F.2d at 113-14).

Soler's reference to the possible availability of five (or six) witnesses who might have provided helpful testimony is entirely conclusory and devoid of detail, much less supporting evidence. Even though he lists six names in his reply, he does not specify whether they would have been willing to testify and, if so, what they would have been prepared to say on his behalf, much less whether any of that testimony would have been admissible. This proffer is manifestly insufficient to trigger Sixth Amendment scrutiny. See, e.g., Rogers v. Chappius, 2013 WL 1825505, *12 (W.D.N.Y. April 30, 2013)(citing cases); Ortiz v. Artus, 2008 WL

---

offers no further elaboration.

2369218, *7 (S.D.N.Y. June 9, 2008), adopted, 2010 WL 3238994
(S.D.N.Y. Aug. 11, 2010).

Soler's only proffer of evidence -- the Abed affidavit -- does
not create a triable issue. Abed, a federal prisoner, does not
profess any personal knowledge of the facts and refers only to
another man, Salvador Mercedes, who supposedly told Abed that he
had seen two men, whom he described as "young Puerto Ricans," enter
Martinez's garage, that he (Mercedes) approached them but they shot
at him and he returned fire, that they fled in a car and that
Mercedes then found Martinez dead in the garage. (Pet. Ex. C). Abed
would not be competent to testify to these facts since his account
is inadmissible hearsay, and Soler does not proffer any basis to
infer that Abed could testify competently to any relevant facts. As
for the individual referred to as Mercedes, Soler does not remotely
hint, much less show, (1) that Mercedes' whereabouts were known to
Soler or counsel at the time of trial,[18] (2) that Mercedes would
have been available and willing to testify at trial, and (3) that,
even if willing to testify, he would have been prepared to offer
any competent evidence of an exculpatory nature. Indeed, even the
second-hand proffer from Abed fails to demonstrate probative value

---

[18] Abed executed his affidavit on May 26, 2009.

for Soler since the trial evidence reflected that two men had entered the garage and shot Martinez on July 2, 1998, and there is no indication that Mercedes would have been in a position to determine that the two men were Puerto Rican, as opposed to, say, Dominican, or that he would not have directly identified Soler as one of the shooters.

Finally, Soler points to correspondence between the prosecutor and defense counsel concerning a prison rumor that someone else may have been involved in the murder of Martinez. The cited letter from the Assistant United States Attorney reported that an inmate named Frank Mejia had suggested to an unnamed cooperating witness that still another inmate -- referred to as "Choqui" or "Chuckee" (also known as Anderson Pena) -- "may have been involved in the murder of Jose Martinez." (Pet'r Reply Ex. D). The report went on to say that Mejia knew "Choqui," and, based on his familiarity with him, doubted the veracity of the rumor. (Id.).

Soler offers no information suggesting that the unknown supplier of this speculation was ever identified by the Government, and he does not suggest, much less demonstrate, (a) that defense counsel had a means to identify this person, (b) that he had the means to contact this unnamed inmate, (c) that the unnamed inmate

63

had any competent testimony to offer, as opposed to an account of prison gossip, (d) that counsel had the ability to contact inmate Pena,[19] (d) that inmate Pena had any competent and exculpatory testimony to offer,[20] and (e) that Pena would have been willing to testify for Soler, presumably to admit his own involvement in the murder.[21]

Soler's only point seems to be that his attorney could have contacted the lawyer for Mejia (see Pet'r Mem. at 37), who was identified in the prosecutor's letter (Pet. Ex. B).[22] As noted, however, he fails to show that Mejia had any competent testimony to

---

[19] As noted, Pena is included in the list of names that Soler proffers on his reply.

[20] Even if we assumed that there was available competent testimony that was exculpatory to Soler, it presumably could not have come from the unnamed intermediary inmate since his account of what someone else told him would have been inadmissible hearsay with regard to Soler's purported innocence. Moreover, admission of a statement against penal interest requires a showing of trustworthiness. Fed. R. Evid. 804(b)(3)(B); see, e.g., United States v. Salvador, 820 F.2d 558, 561 (2d Cir. 1987) (discussing hearsay exception under Rule 804(b)(3)(B)). Soler entirely fails to make such a showing as to any possible testimony by uncalled witnesses.

[21] We further note that the hearsay exception for statements against penal interest does not cover portions of statements that simply purport to exonerate a defendant. See, e.g., United States v. Vega, 27 F.3d 773, 782 (2d Cir. 1994).

[22] The record does not reflect whether Soler's attorney reached out to that lawyer.

64

offer, much less that he was willing to do so. In short, this entire argument by Soler to the effect that counsel failed adequately to prepare the case rests on unvarnished speculation and hence fails to trigger the need for a hearing, much less section 2255 relief. See, e.g., Gonzalez, 722 F.3d at 131; Aiello, 814 F.2d at 113-14. See also Ortiz, 2008 WL 2369218 at *7.

CONCLUSION

For the reasons stated, we recommend that Soler's motion to amend and his motion to vacate his conviction be denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Loretta A. Preska, Room 2220, 500 Pearl Street, New York, New York 10007-1312 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S.

65

140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y

of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989); 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED: New York, New York
        September 17, 2013



                              RESPECTFULLY SUBMITTED,



                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Report and Recommendation have been
mailed today to:

Mr. Alfred Soler, # 57421-054
USP Lee
U.S. Penitentiary
P.O. Box 305
Jonesville, Virginia 24263

Jillian B. Berman, Esq.
Assistant United States Attorney, S.D.N.Y.
One St. Andrews Plaza
New York, New York 10007